STATE v. MILFORD BURTON LYTLE.[1]

January 2, 1943.

No. 33,305.

[1]Reported in 7 N. W. (2d) 305.

*Elwood Fitchette, Herbert Horner,* and *John Ott,* for appellant.
*J. A. A. Burnquist,* Attorney General, *Ralph A. Stone,* Assistant Attorney General, *Frank J. Williams,* County Attorney, *William G. Compton,* First Assistant County Attorney, and *William D. Gunn,* Assistant County Attorney, for the State.

LORING, JUSTICE.

Defendant was convicted of arson in the third degree for burning the mill and elevator property known as the Harbor mill at 410 First street south between Third and Fifth avenues south in Minneapolis. He has appealed from an order denying his motion for a new trial.

The questions presented by the appeal are (1) whether the evidence is sufficient to sustain the verdict; (2) whether the court erred in admitting the evidence of experienced firemen that some inflammable substance extraneous to the building and contents contributed to the speed with which the fire burned, the manner in which it burned, and the manner and speed with which it spread; (3) whether the state was guilty of misconduct in its opening statement to the jury which was so prejudicial to defendant that he was entitled to a new trial; (4) whether it was error to admit

certain conversations which occurred in the presence of defendant relative to the best manner in which to set such a fire; (5) whether the state was guilty of prejudicial misconduct in its closing argument; and (6) whether the court erred in one of its instructions to the jury.

■ The most important question presented is whether the evidence is sufficient to sustain the verdict. The theory of the state was that defendant was in financial straits and that he burned the building in order to realize something out of the $15,000 insurance on the building, which the insurance companies had advised him would be cancelled as soon as the corn stored in the elevator should be removed. The last of it was to be taken out May 7.

An obstruction on First street was at that time being protected at night by kerosene-burning flares. Henry Acker, an employe of the H. N. Leighton Construction Company, which had charge of the flares, attended to setting them out and kept the kerosene in two square five-gallon cans stored on the Harbor property. He had the cans filled with kerosene May 6. The flares burned about ten gallons of kerosene a week. It is the theory of the state that after all the employes had left the Harbor mill and elevator at four p. m. on May 6 and after the flares had been set out at 5:30 p. m. defendant returned to the mill, took a round five-gallon can with a spout on it, poured into it the kerosene from the square cans, which were inconvenient to carry or pour from, and then distributed the kerosene around the building so that the fire would start more easily and spread rapidly. It is the further theory of the state that after spreading the kerosene he left the building about seven p. m. and returned about midnight, when he set the fire and left through the back door of the building. He was seen and recognized when he left around seven o'clock, but no one saw him return. The round can with the spout on it had been used for lubricating oil and for water, but shortly after the fire it was found floating in the channel which flows past the back door of the building. Its contents were analyzed and found to contain

kerosene. It is the state's theory that after completing the distribution of the kerosene with this can defendant, either after he spread the kerosene or when he left the building by the back door around midnight, threw the can into the channel with the expectation that it would float off down the river; that he then walked northwesterly up the river side of the old foundation, which was northwesterly of the Harbor mill property proper, and followed a path up to First street, walking southeasterly on that street until he reached an opening in the fence on the southerly side of that street, which led him into the Milwaukee yards, where, just before the fire was discovered, it is claimed that he was seen by the witness Michael J. Kane walking in the general direction of Third avenue; that after reaching Third avenue he walked south on that street until he came to Washington avenue south, where he boarded a streetcar running to Second avenue south; that he got off this car at Second avenue and boarded the Grand-Monroe car, but, either in fear that he might be identified by some of the passengers on the Grand-Monroe car or disturbed by a conversation about the fire, he got off and walked to Marquette avenue, where he took another streetcar for his home.

The state introduced evidence tending to prove that the defendant was in financial straits, that the burned property was insured, and that the insurance was about to be cancelled. This evidence was admissible as tending to prove motive. State v. Roth, 117 Minn. 404, 136 N. W. 12. The evidence also tended to prove that the building which was burned had been purchased by defendant in 1939 for the sum of one dollar and the assumption of the taxes, aggregating over $7,000. Defendant did not pay these taxes. He testified that he borrowed money and put $3,200 into improvements on the property. He still owed $1,500 for labor and material. He claims to have $10,849.65 due him from the Commodity Credit Corporation for storage of grain, although some question was raised about the deduction from that sum of heavy penalties amounting to some $7,000. Of the money from the credit corporation, $4,300 had been assigned to the National Surety Com-

pany to reimburse it for repairs to the property. Defendant owed at least $750 for fire insurance premiums and was indebted on various other small accounts. He was behind $300 or $400 in his apartment rent.

Defendant testified that he was not at the Harbor mill after 4:30 on the afternoon of May 6, but he was seen leaving there about seven by the engineer of the Consolidated Flour Mill, who knew him very well. He left by way of the door of the mill which led to First street and walked toward Third avenue. When he left the building he was seen to try the door after he had closed it. This is the same door that the firemen found bolted from the inside when they attempted to enter the property after the fire had started. The necessary inference from that is that someone who had access to the building entered it later, bolted the door from the inside, and left by some other exit. After the fire, defendant made a statement to the fire marshal in which he denied that he had been in the vicinity of the building at or about the time that the fire started. His story under oath to the fire marshal was that he left the Harbor mill at 4:30, about half an hour after the crew had quit; that he went directly home from there, except for a stop at the Radisson Hotel; that he had dinner with his family and after that went to a wrestling match at the Auditorium; that after the wrestling match he started home but got interested in an argument which a couple of fellows had at an automobile collision. He said that he stood around watching the ensuing fight for about an hour and then went to the Happy Hour club and sat there for an hour and a half with some person he had met while he was witnessing the fight over the cars. He said that he did not drink any liquor himself but that his companion had quite a number of drinks at the Happy Hour; that he then went home, arriving about 12:30; that he had no telephone at his house and did not get the news of the fire over the radio or know anything about it until the next morning when he stopped at the Chamber of Commerce and got a paper about eight o'clock.

Contrasted with defendant's story to the fire marshal is the

testimony of Alfred Berg, a motorman-conductor on a one-man Grand-Monroe car. The route of his car from north to south was across the Third avenue bridge over the Mississippi River, then to Second avenue south, from where it turns onto Eighth street and runs to Marquette, then onto Nicollet avenue, where it runs to Lake street, from where it finally turns onto Grand avenue. At 12:25 or 12:30 a. m. on May 7, Berg's car reached the intersection of Second avenue south at Washington avenue on its southbound trip. At this point other cars from Washington avenue lines stop for late transfer traffic, and Berg waited for those cars. He was there for about ten minutes. He testified that defendant got on his car at that point, handing him a green transfer, which indicated that he came from a Thirty-fourth and North Bryant car on Washington avenue, which, if it came from the east, had crossed Third avenue at the Milwaukee station. Berg had only four passengers in addition to defendant, who, after he handed him the transfer, stood near him at the front of the car. After defendant handed Berg the transfer, a man came from a Bloomington car which had stopped behind Berg's car, rapped on the front door, which Berg opened, and asked if there was a "cop" around that corner. Berg did not know and said that he rarely saw anybody on that corner. He inquired if there was any trouble, and the man said, "No, didn't you see a fire in the elevator?" Berg replied, "No, I didn't." Defendant then said to Berg, "I wonder if I could get my fare back, I am dry, I want to go and have a drink," so Berg returned his green transfer. Berg's identification of defendant was positive and corroborated by Poole and Keller, employes of the Standard mill, who had gone off shift at 12 o'clock and were two of the four passengers on the Grand-Monroe car. They were sitting next to the front cross-seat on the left-hand side of the car. When defendant got on the car one of them remarked to the other that there was the man who had bought the old mill.

After these witnesses had so testified, defendant admitted on the stand that his previous statement to the fire marshal was a deliberate falsehood and that he was on the Grand-Monroe car at the

time Berg, Poole, and Keller saw him, but denied hearing the conversation in reference to the fire. He also admitted that he had not been to the Happy Hour club that evening or seen any automobile accident or heard any controversy about one. He claimed that after the wrestling match he had gone to the Radisson and Nicollet hotels seeking a ride to Duluth and that from the latter hotel he boarded a streetcar going east to Second avenue on Washington and there transferred to the Grand-Monroe car. His explanation of why he lied to the fire marshal was that he did not want to let his wife know that he was so hard up as to seek an automobile ride to Duluth, whereas he admitted that she had charge of paying the rent on their apartment on which they were $300 to $400 behind.

The witness Michael J. Kane, special agent for the Milwaukee railroad, whose duty it was to patrol the railroad yards immediately south of the Harbor mill, testified that shortly after midnight on the night of May 6 he was standing near the dump in the westerly portion of the track area looking toward the gateway in the fence which ran between the railroad tracks and First street. The gateway was opposite the east end of the Harbor mill building and about opposite the laboratory which stood between the mill building proper and its garage. He saw a man approaching him across the track area, which was well lighted by a floodlight of the Ceresota mill and by other lights in that vicinity. He saw a puff of smoke from the direction of the Harbor mill when this man reached a point about 150 feet from him. He paid little attention to the puff of smoke, thinking that it was from a railroad engine on the tracks behind the mill. He saw another puff of smoke a few seconds later and still conceived it to be from a railroad engine. But when this man who was approaching him arrived at a point about 50 to 75 feet from him he saw a flame arising from the Harbor mill and immediately ran to turn in an alarm to the police. It was then 12:20 by his watch. From the telephone station he then ran to the corner of Third avenue and First street so as to turn traffic and give the fire equipment a

chance to make a swing from Third avenue into First street. It took him about four minutes from the time he saw the blaze to put in the telephone call and to get to the corner of First street and Third avenue. By that time he said that the fire appeared to have spread the whole length of the Harbor building. Kane did not see the man who walked across the yard closely enough to distinguish his features, but he identified defendant as follows:

"Q. Mr. Kane, did you ever see this man you saw walking across those yards at the time you saw that fire, again?

"A. Yes, I did.

"Q. When?

"A. On the afternoon of June 4.

"Q. And where were you at the time?

"A. I was standing in that same place I was the night I saw the fire.

"Q. Did any one suggest to you that you stand there?

"A. No, not in the same place.

"Q. Now, state the circumstances under which you saw this man on the afternoon of June 4.

"A. Well, he was walking across there with Fire Chief Spottswood.

"Q. Towards you?

"A. Right in the same direction, yes, right towards me.

"Q. And you say that was the same man you saw coming across here on the night in question?

"A. Well, he had the same identical gait and arm movement and about, I would say, the same size.

"Q. Do you see that man now?

"A. Yes, sir, I think I do.

"Q. Where?

"A. At the rear corner of the table there (indicating).

"Q. This defendant?

"A. Yes, sir."

Identification may be sufficient though facial features are not

identified. It may be reasonably sure though based on other peculiarities. State v. Mason, 152 Minn. 306, 189 N. W. 452; State v. Farmer, 179 Minn. 516, 229 N. W. 789. The fact that within a few minutes after the fire was discovered defendant was positively identified taking the nearby streetcars strongly supports Kane's identification of him. State v. Goldman, 166 Minn. 292, 207 N. W. 627.

The state also produced the testimony in regard to finding, on the day following the fire, the five-gallon can floating in the channel which flows past the rear of the building. This can, though used by the crew of the Harbor mill for lubricating oil and then for water, contained kerosene at the time it was found.

Defendant, and defendant only, had a motive for setting the fire and an expectation of some profit or solution of his financial difficulties by collecting insurance. The jury was amply justified in believing that he was seen in the vicinity of the Harbor mill earlier in the evening and again immediately after the fire. Perhaps the most convincing evidence of a sense of guilt was his denial under oath before the fire marshal of his presence at the mill or in its vicinity after 4:30 in the evening before the fire. This, coupled with his unusual actions on the streetcar after he presumably heard the conversation between the motorman and the man from the Bloomington car, was convincing evidence of guilt. His explanation might well have been regarded as a fabrication. The jury was justified in disbelieving his entire testimony. The circumstantial evidence abundantly justified conviction. That both the *corpus delicti* and the guilt of defendant may be so proved is too well established in this state to justify citation of authorities.

■ The evidence of the experienced firemen did not go further than to state that in their opinion some inflammable substance other than that of which the building was constructed or which it contained contributed to the manner and speed with which the fire burned and spread. These witnesses testified from what they observed when they reached the fire in its early stages. They went no further than to say that it appeared to burn and spread like a "boosted" fire. They did not testify that in their opinion it was

an incendiary fire, as did the witnesses in some of the cases cited by defendant. This question does not seem to have been squarely presented to this court in any previous case. The supreme court of Oregon in First Nat. Bank v. Fire Assn. 33 Or. 172, 191, 50 P. 568, 53 P. 8, and State v. Director, 113 Or. 74, 87, 227 P. 298, 231 P. 191, has held that similar evidence is admissible from experienced firemen who observed the fire. It said that they might testify whether in their opinion the fire was burning naturally upon the known substances it had to feed upon. We think there was no error in admitting this evidence.

A fire occurred in the Harbor mill in the month of March, preceding the fire with which the defendant is charged. At that time a conversation between Mr. Thompson of the Fire Prevention Squad and some other person occurred in the presence of defendant during which Mr. Thompson in substance described how a good fire could have been started in the building. Apparently referring to that conversation, the state in its opening statement to the jury undertook to give the substance of what Mr. Thompson had said in response to a suggestion that the fire might have been incendiary. The statement was that Mr. Thompson had said:

"That such a theory was absolutely foolish, that nobody would start a fire under ten or more feet of grain, that the way to have a good fire would be to take five or ten gallons of kerosene and go up to the top floor and dump it down on the corn, and ignite it, or words to that effect, and then you would have a good fire."

It was the theory of the state that defendant had used kerosene to start the fire of May 7, and it introduced evidence of this conversation for the avowed purpose of proving that defendant had got instructions from an expert on how to start a fire in the building that subsequently burned. The evidence was of little probative force, because almost anyone who has ever started a fire in a kitchen stove knows that kerosene expedites the starting of it. Its admission was without prejudice, as was the conversation itself.

■ We find nothing prejudicial in the state's closing argument to the jury which is now complained of. It was no more than a statement of the conclusions which the state contended the jury was entitled to draw from the circumstantial evidence presented.

■ Nor do we find prejudicial error in the part of the charge complained of. After the close of the testimony defendant took exception to numerous parts of the charge but not to the specific part here complained of. Consequently, if there is any mere verbal inadvertence, it comes within the rule of Steinbauer v. Stone, 85 Minn. 274, 88 N. W. 754. The part complained of reads as follows:

"It (the State) produced some witnesses who established, according to their testimony, that the defendant was in the vicinity of the fire or of the building at about the time the fire broke out. He was identified by some of the State's witnesses."

The defendant himself upon the trial, and contrary to the statement made before the fire marshal, admitted that he was on the Grand-Monroe car at the intersection of Washington and Second avenues. If counsel did not like the use of the word "established" he should have invited the court's attention to it at the time. To our minds, any vice in the use of that word was eliminated by the following phrase, "according to their testimony."

The order appealed from is affirmed.