STATE v. JOHN KOLANDER.[1]

March 21, 1952.

No. 35,456.

---

[1]Reported in 52 N. W. (2d) 458.

*Alfred J. Weinberg,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Thomas J. Naylor,* County Attorney, and *John C. Arko,* Assistant County Attorney, for the State.

KNUTSON, JUSTICE.

Defendant was convicted of the crime of arson in the third degree. He appeals from an order denying his motion for judgment notwithstanding the verdict (which was considered by the trial court as a motion for dismissal) or for a new trial. The information charges that defendant did wilfully, wrongfully, unlawfully, and feloniously burn and set on fire a motor vehicle. In view of the fact that the evidence upon which the conviction rests is entirely circumstantial, a rather detailed statement of the evidence is essential to an understanding of the problems raised by this appeal.

At the time of the alleged commission of the crime defendant lived with his father in Duluth. He was then an unmarried man. For a time during his youth defendant had lived near Zim, which

is about 18 miles south of Hibbing. While living there, he became acquainted with Niilo Luikkonen and other members of Niilo's family. Defendant's sister is married to a brother of Niilo, Dave Luikkonen, and they lived near Zim. About a week before December 8, 1946, defendant visited his sister. While there he renewed his acquaintance with Niilo Luikkonen. Before he left for his home he made arrangements with Niilo to visit him again in the near future. On December 5, he mailed a letter, written in Duluth, to Niilo saying that he would see him on "Sunday afternoon between 3 and 4 as we agreed." On Sunday morning, which was December 8, he left Duluth on a bus. The house in which he had been staying with his father had been sold, so he took most of his belongings with him in a suitcase. He arrived in Hibbing about one o'clock in the afternoon. It had been prearranged that Niilo would pick him up at the bus depot. Niilo was busy helping his brother put up hay and saw wood, and he also wanted to check his trap lines, so arrangements were made to have Kenneth Luikkonen, a son of Dave and defendant's sister, go to Hibbing to pick up defendant in place of Niilo. Accordingly, Kenneth and his girl friend drove to Hibbing and picked up defendant at the bus depot about three or four o'clock. Defendant had no luggage with him at that time. He informed Kenneth that he had checked his suitcase and would pick it up later. Kenneth took defendant to the John Waldo farm near Zim, where he met Niilo about 4:30 p. m. From the Waldo farm, defendant and Niilo drove to the home of Dave Luikkonen in Niilo's car. Defendant had brought two pints of whiskey with him from Duluth. On the way to Dave's home they opened one bottle and drank some of the whiskey, and at Dave's home they finished the first pint, with the help of Dave, and opened the other pint and consumed about a quarter of its contents. They then had a lunch, and about 6 or 6:30 defendant and Niilo went to the latter's house, where Niilo changed from his working clothes into other clothes. The next morning Dave found the whiskey bottle still about one-quarter full. They left Niilo's house about eight or nine o'clock and drove to Buddy's Tavern,

located a short distance away. While there, Niilo visited with a friend, Fred Maki.

Up to this point there is not much conflict in the evidence. From this point on, the evidence of defendant and that of the witnesses called for the state cannot be reconciled. There is a dispute in the evidence as to when defendant and Niilo left Buddy's Tavern. Battista Anselmo, the owner of Buddy's Tavern, said that they came about seven or eight o'clock and left about nine or ten. Fred Maki testified that they were there when he came at eight o'clock and that they left before he did, which was about ten o'clock. He thought that they left about nine o'clock. Another witness, Knute Brosie, testified that he arrived at the tavern about nine o'clock and that they were there then; that he left about 9:30 and they were still there. Defendant testified that he and Niilo left between 10 and 11 p. m. It is not disputed that before they left they purchased about five gallons of gasoline, which Anselmo filled into the car. Defendant paid one dollar for the gasoline. The car was then facing east in the direction of Duluth. Defendant drove as they left Buddy's Tavern. That is the last time Niilo has ever been seen or heard from. He completely vanished, and no trace of him has ever been found.

Niilo's car was later found on a dirt and gravel side road, known as the Kane Road, at a place about six or seven miles from Mountain Iron. The spot where the car was found is further located as being about two and one-half to three miles from the intersection of Kane Road with U. S. Highway No. 169; five or seven miles from Virginia; and eight to ten miles from Buddy's Tavern. The car had been driven off the road into the area immediately bordering the road and, when found, was badly destroyed by fire. The interior was nearly completely gutted. The glass in the windows had been completely melted out. The rear tires had been partly burned, and the exterior of the car was also burned near the rear. The engine and front part of the car were not damaged.

Of the five young people who witnessed the fire that night, the state called as witnesses the three boys: Herbert Hall, Tom Rebro-

vich, and Paul Horoshak. They testified that on the evening of December 8 they were taking two girls home from Eveleth to Mountain Iron along the Kane Road; that they observed the car, later identified as Niilo's car, along the side of the road about 11 or 11:30 p. m.; that it was then on fire; and that they stopped to view it. Herbert Hall testified that one rear tire was burning and that the inside of the car was practically burned out, but that the seats were still smoldering. There was no one in or near the car. The boys testified that it was snowing lightly and that they could observe one set of footprints leading from the driver's side of the car to the rear and then along the road toward Mountain Iron. In much of his testimony Hall was corroborated by Rebrovich. Horoshak said that he did not look into the car, but saw that it had burned and that the tire was flickering. Four miners who were called as witnesses testified that they lived at Eveleth and were traveling the Kane Road to their work at Chisholm on the morning of December 9; that they passed the car about 7:30 a. m. and that it had been burned at that time; and that they saw it again on their way home about 4:30 that day, but did not stop to examine it until Wednesday of the same week. One of the miners was a brother of Herbert Hall. The two brothers discussed the matter between them; and Herbert fixed the date when he first saw the car as the night before his brother saw it. The state also called one William E. Holmes, a temporary mail carrier who delivered mail over this route. He testified that he saw the car on Monday, December 9, at 9 or 9:15 a. m., and that the car was then burned; that he saw no fire or smoke at that time; that he traveled the route only on Mondays, Wednesdays, and Fridays; and that on the Wednesday after he first observed the car he stopped to look at it and then observed that the interior was badly burned.

On Wednesday, December 11, C. P. Murphy, a deputy sheriff from Virginia, went out to investigate the car. He found the inside almost completely burned out. At that time he did not know whose car it was, nor had the disappearance of Niilo been reported.

Defendant's version of the night's activities is completely inconsistent with the above evidence. He testified that he left Buddy's Tavern about eleven o'clock and drove to Hibbing; that they stopped at the Rex Tavern in Hibbing, where they drank some beer; that Niilo obtained a fifth of whiskey at that place; and that they remained in the tavern until closing time and then left. Defendant claims that they then called on some friends of Niilo's who lived in Hibbing. He stated that they were elderly Finnish people about 55 years of age and that they were friends of Niilo's but were unknown to him; that they had some drinks from Niilo's fifth of whiskey at that place; that they left this house sometime between one and two o'clock in the morning and drove back to the bus depot, where defendant was going to pick up his suitcase; that they found the depot locked, so they parked their car in a parking lot and went to sleep in it; that they slept until about 6 a. m., and when the depot opened defendant picked up his suitcase; that they then had a cup of coffee and some rolls, after which they drove to Virginia, where they arrived about 8 a. m.; that they talked together about 20 minutes at Virginia; and that defendant then went into a tavern where he inquired about obtaining a room and was referred to the Holland Hotel. Defendant further testified that he went to such hotel and registered for a room. The hotel register, which was introduced in evidence, shows that he did obtain a room sometime during December 9, but the register, unfortunately, omitted the time of day when he arrived. Defendant then testified that after obtaining a room he went to bed and slept until about 1 p. m. and then got up and called his fiancee at Duluth. The record shows that he did make such call. He was seen by his cousin, Toivo Rahakainen, about 2 p. m. Defendant testified that he spent the rest of the day and that night in his room and took the bus back to Duluth about 8 a. m. the next morning.

On December 17, 1946, Dave Luikkonen reported the disappearance of Niilo to the sheriff. Defendant was questioned about Niilo's disappearance, and he told substantially the same story as he told

when testifying in his own behalf and has adhered to that story since he was first questioned by the sheriff.

About a week or ten days after defendant and Niilo had been in Buddy's Tavern, Fred Maki, the person who had visited with Niilo in the tavern, received a Christmas card in the mail, purporting to come from Niilo. It bore a Virginia postmark, but no date of mailing. It carried a brief printed Christmas message and was signed "Nebs." Niilo went by the nickname Nibs. Maki testified that he had never corresponded with Niilo and had never received any cards from him prior to that time. The state called one Ralph E. Kirpach as a handwriting expert. He testified that in his opinion the address on the envelope in which this card was received and the signature "Nebs" on the card were written by defendant.

At the time he disappeared Niilo was working as a section hand on the railroad. He had earned and had coming wages in the amount of $39.14. He has never called for these wages. He had United States savings bonds with a maturity value of $1,075, which at the time of the trial were in the possession of his relatives and which have never been claimed. So far as the record shows, he had on his person at the time of his disappearance only $17.50, which amount had been paid to him for furs on December 8 by a fur buyer. He was in good health, and apparently nothing was troubling him.

The state relies also upon the fact that the sheriff of St. Louis county and 22 deputies on more than one occasion made a thorough search of the entire area where the car was found, but that no trace of Niilo was unearthed. Defendant was taken to Hibbing by the sheriff, but was unable to find the home of the friends of Niilo with whom he claims they visited on the fateful night. He has never gone back to search for this home himself. The sheriff caused letters to be mailed to defendant from various places throughout the United States purporting to have been written and mailed by Nebs. Defendant never mentioned receipt of these letters to the sheriff until he was questioned about them, when he stated that he had never brought them to the sheriff because he wanted to keep them.

Defendant's assignments of error, which we deem essential to a determination of the appeal, may be summarized as follows:

(1) Is the evidence sufficient to establish the corpus delicti and the criminal agency of defendant?

(2) Was it error to permit the deputy fire marshal to express an opinion as to the nature of the fire involved?

(3) Was it error to permit the state, over the objection of defendant, to show that defendant had refused to submit to a lie-detector test?

(4) Were statements made by the prosecuting attorney in his summation to the jury so prejudicial as to require a new trial?

(5) Was it error to permit a handwriting expert called by the state to express an opinion?

Defendant contends that the evidence is insufficient to establish either that the car was burned by a fire criminally set by anyone or that defendant had any connection with setting it; therefore, that he is entitled to be discharged.

Within the established rules respecting conviction of a crime upon circumstantial evidence, it is clear that circumstantial evidence may establish both corpus delicti and the criminal agency of the defendant in an arson case. State v. O'Hagan, 124 Minn. 58, 144 N. W. 410; State v. Jacobson, 130 Minn. 347, 153 N. W. 845; State v. McCauley, 132 Minn. 225, 156 N. W. 280; State v. Burnstein, 158 Minn. 122, 196 N. W. 936; State v. Tuomi, 167 Minn. 74, 208 N. W. 528; State v. Fredeen, 167 Minn. 234, 208 N. W. 653; State v. Rosenswieg, 168 Minn. 459, 210 N. W. 403; State v. McTague, 190 Minn. 449, 252 N. W. 446; State v. Lytle, 214 Minn. 171, 7 N. W. (2d) 305.

The court properly instructed the jury that—

"to warrant a finding of guilty on any of the material elements of the crime charged based on circumstantial evidence the facts proven by circumstantial evidence must be consistent with each other, they must be consistent with the theory of guilt and exclude the theory

of innocence, and must exclude every other reasonable conclusion except that of the guilt of the defendant."

Tested by these rules, does the evidence and the inferences reasonably to be drawn therefrom sustain the findings of the jury? It is apparent at the outset that if the jury believed the testimony of the state's witnesses it would be compelled to reject, almost in its entirety, the testimony of defendant relating to his activities after leaving Buddy's Tavern. If the car was seen burning at 11 or 11:30 p. m. Sunday and was seen the next morning in its burned condition, it could not have been where defendant claimed it was. Viewing the evidence in the light most favorable to the verdict, as we must, the jury could find that within an hour or an hour and a half after defendant and Niilo left Buddy's Tavern, with defendant at the wheel, the car was driven to the place where it was found and burned by a fire causing a heat intense enough to burn out the entire interior, melt all the glass in the car, set fire to the top of the tires, and burn the paint on the exterior of the car.

The state called as one of its witnesses Ingworth John Erickson, a deputy fire marshal. He first examined the car in the fall of 1949, some three years after it was burned. It was shown that the car had been in the yard of the county garage during that time; and, while it had been moved about from time to time, it was in substantially the same condition as it was when first discovered. Basing his opinion on what he saw from his examination of the car and his past experience in investigating hundreds of arson cases, he was permitted to state that in his opinion the fire was "torched"; that is, aided by some foreign substance such as gasoline. He stated that it would take an intense fire to melt the glass, burn out all the cushions, ignite the rubber tires, and cause the destruction that was done to this car. It was his opinion that this could not be done by a fire which started naturally in the combustible material in the car, for such material, if ignited, will burn slowly, unless aided by some agent such as gasoline, which is highly combustible. Defendant contends that it was error to permit Erickson to state his opinion as to the nature of the fire. While considerable time had elapsed

between the time of the fire and the time when Erickson first saw the car, much of his opinion is based on an observation of things which would not be affected by the lapse of time. The fact that it takes an intense fire to melt glass, ignite rubber, or burn the cushions in a car furnished to a large degree the basis for his opinion. The sufficiency of the foundation was a matter resting largely in the discretion of the trial court, and we do not believe that it was error to permit such opinion evidence. The witness was sufficiently qualified by showing that he had had considerable experience in investigating fires of incendiary origin over a period of 19 years. See, State v. Lytle, 214 Minn. 171, 7 N. W. (2d) 305.

Even in the absence of the opinion evidence of Erickson, the jury would have been justified in finding that this fire was of an incendiary origin. It must have been apparent to all that the fire had been intense. The jury would be justified in concluding that within an hour or an hour and a half after the parties left Buddy's Tavern the car must have been driven some distance to the place where it was found and that the fire which ensued must have burned quickly enough so that when the car was first seen about 11 or 11:30 p. m. it had practically burned itself out after almost completely gutting the interior of the car, melting the glass, burning the paint on the outside, and igniting the tires. No effort had been made to put out the fire, although there was enough snow present to put out a fire which had started to smolder in the cushions.

The evidence relied upon to establish the second essential element of the crime is far less convincing. While there is evidence that only one set of footprints left the car when it was first observed, there is nothing to show that such footprints belonged to defendant. There is, however, the undisputed fact that when the car left Buddy's Tavern defendant was behind the wheel. He is the only one who returned. The jury could well conclude that his entire testimony was a fabricated story intended to conceal his actual movements. It could also conclude that he sent the Christmas card to Fred Maki to divert any suspicions that he knew what had become of Niilo. Defendant has never made any attempt to find the elderly couple

with whom he claims he and Niilo spent the late evening of December 8 or the early morning of December 9, although his presence and that of the car involved with such couple at the time when he claims he was there would have provided him with a complete alibi. There are other circumstances, such as his failure to report receipt of letters purporting to come from "Nebs" which were mailed by agents of the sheriff to him; but, taking the evidence as a whole, we cannot say that the jury would not be warranted in finding that the car was destroyed by defendant.

As grounds for a new trial, defendant first claims that it was error to permit the state to show that he had refused to submit to a lie-detector test. In the examination of a witness for the state, F. K. Busyn, who at the time of the alleged commission of the crime was a deputy sheriff for St. Louis county, the following proceedings took place:

"Q. Did you ask him at that time to submit to anything?

"A. Yes, we asked him if he would like to submit to a lie detector.

"Mr. Weinberg: If the Court please, that is definitely incompetent, immaterial, and improper direct examination, no showing that this man was ever advised of any constitutional rights.

"The Court: I think the objection will be overruled.

"By Mr. Arko:

"Q. You may proceed.

"A. Yes, we did.

"Q. What did you ask him?

"A. We asked him of course if he did it was purely on a voluntary basis, and also that if that wouldn't be satisfactory probably we could try some truth serum.

"Q. What did he say?

"A. I think he used the words that it was all hokus pokus and he didn't think much of that.

"Q. And did he refuse to submit?

"A. Yes, he did.

"Mr. Weinberg: Well, now, if the Court please, showing in the record the refusal of the defendant to testify or make a statement on the basis of the truth serum test we submit is prejudicial, incompetent, irrelevant and immaterial.

"The Court: Motion denied. Of course, the jury understands he did not have to take one unless he wanted to and probably no inference adverse to him should be—the jury should not consider anything adverse to him, the fact that he refused to take it."

A great deal has been written on the development and reliability of the so-called lie detectors,[2] but up to the present time the almost unanimous holding of all courts which have passed upon the question is that the results of such tests are inadmissible. The holding of the courts generally is based on the reasoning that the tests have not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify courts in admitting expert testimony deduced from the discovery, development, and experiments thus made. Frye v. United States, 54 App. D. C. 46, 293 F. 1013, 34 A. L. R. 145 (defendant had submitted to test and offered the scientist who had conducted the test as expert to testify to results; held not error to sustain objection to offer); State v. Lowry, 163 Kan. 622, 185 P. (2d) 147 (new trial granted for error in admitting evidence over defendant's objection); People v. Wochnick, 98 Cal. App. (2d) 124, 219 P. (2d) 70 (new trial granted where results of lie-detector tests were not offered, but evidence admitted indirectly in the form of a purported accusatory statement based on the test was held prejudicial); State v. Cole, 354 Mo. 181, 188 S. W. (2d) 43, 189 S. W. (2d) 541 (not error to overrule defendant's motion that all witnesses, both for state and defendant, be subjected to lie-detector test); People v. Becker, 300 Mich. 562, 2 N. W. (2d) 503, 139 A. L. R. 1171 (not error to refuse

[2]Much material on this subject may be found collected in articles or notes in 35 Minn. L. Rev. 310; 29 Cornell L. Q. 535; 24 Col. L. Rev. 429; 37 Harv. L. Rev. 1138; 33 Yale L. J. 771; 1943 Wis. L. Rev. 430; Wigmore, The Science of Judicial Proof (3 ed.) § 314; 3 Wigmore, Evidence (3 ed.) § 999.

to allow result of lie-detector test to be admitted at request of defendant) ; People v. Morse, 325 Mich. 270, 38 N. W. (2d) 322 (rule applicable to lie-detector tests applied to drunkometer test) ; Boeche v. State, 151 Neb. 368, 37 N. W. (2d) 593 (not error to refuse to admit evidence of results of test) ; State v. Bohner, 210 Wis. 651, 246 N. W. 314, 86 A. L. R. 611 (not error to refuse testimony of result of test made outside of court) ; LeFevre v. State, 242 Wis. 416, 8 N. W. (2d) 288[3] (holding that where defendant and prosecuting attorney had entered into a stipulation that the findings of test could be used by either defendant or the state on trial the results of such test were properly excluded when offered by defendant) ; State v. Pusch, 77 N. D. 860, 46 N. W. (2d) 508 (not error to refuse to admit results offered by defendant) ; People v. Forte, 279 N. Y. 204, 18 N. E. (2d) 31, 119 A. L. R. 1198 (not error to refuse to reopen case after evidence was in to permit defendant to be examined by lie detector).

Apparently the only case in which the matter has been considered at all by us is that of State v. DeZeler, 230 Minn. 39, 41 N. W. (2d) 313, 15 A. L. R. (2d) 1137, where we indicated that the results of such test are inadmissible.

The only recorded case to the contrary is People v. Kenny, 167 Misc. 51, 3 N. Y. S. (2d) 348, an opinion written March 29, 1938, by the Queens county court trial judge, which apparently was never appealed. The court of appeals in the later case of People v. Forte, supra, decided November 29, 1938, did not mention the Kenny case.

For Annotations on the subject, see 34 A. L. R. 147, 86 A. L. R. 616, 119 A. L. R. 1200, 139 A. L. R. 1174.

We have no doubt that the lie detector is valuable in investigative work of law enforcement agencies and may frequently lead to confessions or the discovery of facts which may ultimately lead to the solution of many crimes; but we are in accord with the rule that the lie detector has not yet attained such scientific and psychological accuracy, nor its operators such sureness of interpretation of results shown therefrom, as to justify submission thereof to a jury as evi-

[3]For a discussion of the Wisconsin cases, see 1943 Wis. L. Rev. 430.

dence of the guilt or innocence of a person accused of a crime.

The state concedes that the results of a lie-detector test would not be admissible, but contends that it may nevertheless be shown that defendant refused to take such test, since such refusal is evidence of a consciousness of guilt similar to evidence of flight. With this we cannot agree. Much the same proposition was advanced in People v. Wochnick, 98 Cal. App. (2d) 124, 219 P. (2d) 70, *supra*. In that case, an officer testified that defendant had been told that he had been placed on the lie detector for a test and that there was a violent reaction when he was shown a certain exhibit; and that when he was asked for an explanation of such reaction he stated that he could not explain it. The trial court instructed the jury that it could not consider that portion of the conversation relating to the lie-detector test as indicating whether or not there was any reaction to any technical test. In holding that it was reversible error to admit the evidence, the California court said (98 Cal. App. [2d] 128, 219 P. [2d] 72):

"Despite the instruction of the court, the evidence of the partial results of the lie detector test with respect to defendant's reaction upon being shown the murder weapon was indelibly implanted in the minds of the jurors and could not but have had a prejudicial effect."

The same is true here. There was no explanation to the jury of the operation or effect of a lie detector. As a matter of fact, it was not even shown what type of test defendant had refused to submit to. The impact upon the minds of the jurors of a refusal to submit to something which they might well assume would effectively determine guilt or innocence, under these conditions, might well be more devastating than a disclosure of the results of such test, if given after a proper foundation had been laid showing how the apparatus functioned. Where a conviction rests so completely on circumstantial evidence, the erroneous admission of such action on the part of defendant might well be enough to tip the scales against him. We believe that it was prejudicial error to permit such refusal of defendant to submit to the test to be shown.

■ Defendant next assigns as error remarks of the prosecuting attorney in his summation of the case to the jury. In his argument to the jury the prosecuting attorney said:

"* * * He is under suspicion not only of having burned the car, but under suspicion of murder.

"Mr. Weinberg: Now, if the Court please, I think that statement again is improper.

"The Court: I think it is proper argument. He is not being tried for murder, of course, but that is proper argument.

"Mr. Arko: Not only under suspicion of arson but under suspicion of murder, a most serious charge, the most serious charge that any man can possibly face. And does the defendant do anything to prove his alibi? Now, if it is true that he was there that night at 1 o'clock on December 8th or 9th—that would be 1 o'clock December 9th, Monday morning—at the home of this elderly couple, there he has two witnesses that can establish a perfect alibi for him that could come into this court room and say, 'Yes, he was with us that night.' Think of it, ladies and gentlemen, and he hasn't made one single effort according to his own testimony to find that out, to find those people, to inquire of friends of his, and he knows them, he lived out in that area, and all Luikkonen's friends or all Luikkonen's relatives, to find those persons, which I say to you here is only a figment of his imagination, something that he has concocted and created out of the thin air.

"Ladies and gentlemen of the jury, the evidence is in. We have before us a very serious case and we are dealing with a desperate and a dangerous man."

We think that the remarks were prejudicial and improper. This is a case which would lend itself easily to a feeling of passion and prejudice. During the trial, the jury had been shown that in 1925 defendant had been convicted of murder in the third degree in a trial at Hibbing. He had been sentenced to Stillwater penitentiary and confined therein from 1925 to 1942, when he was paroled. He was returned to prison for some reason not shown by the record and finally released in 1945. It is also apparent that Niilo in some

mysterious manner had disappeared. It would be natural that there would be a strong suspicion that he had met with foul play. The evidence connecting defendant with the crime of arson was extremely meager. In a case such as this, where the opportunity is present of easily arousing the passion and prejudice of the jury, the prosecuting attorney should have been especially careful not to bring in extraneous matters which might cause the jury to convict a defendant upon suspicion that he might have committed some crime, if not the one of which he was charged. Regardless of his past record, defendant is entitled to a fair trial.. There is nothing in the evidence to show that he is a desperate or dangerous man, aside from his former conviction and the inferences which might be drawn therefrom. A conviction of arson based upon a suspicion that he might be guilty of murder cannot stand.

What we said in State v. McTague, 190 Minn. 449, 455, 252 N. W. 446, 448, regarding the extent to which a defendant who takes the stand in his own behalf may be cross-examined concerning his past life, applies equally to the arguments of the prosecuting attorney here. We there said:

"* * * The state cannot go so far as to favor or induce a conviction because the defendant is a generally bad man and society should get rid of him, since it has him on trial, irrespective of his guilt of the particular offense charged."

■ Defendant further contends that it was error to admit the opinion evidence of the witness Ralph E. Kirpach called as a handwriting expert. The sufficiency of the foundation establishing the qualification of the witness as an expert is a matter left largely to the discretion of the trial court. We have examined the evidence and find no abuse of discretion. The weight of the evidence was for the jury.

In view of the errors mentioned above, there must be a new trial.
Reversed and new trial granted.