STATE of Minnesota, Appellant,

v.

**Robert Paul DRESSEL, Respondent.**

**No. A08–2130.**

Court of Appeals of Minnesota.

May 19, 2009.

Lori Swanson, Attorney General, St. Paul, Patrick J. Ciliberto, Scott County Attorney, Todd P. Zettler, Special Assistant County Attorney, Shakopee, for appellant.

Daniel L. Gerdts, Brink & Gerdts, P.A., Minneapolis, for respondent.

Considered and decided by ROSS, Presiding Judge; TOUSSAINT, Chief Judge; and JOHNSON, Judge.

## O P I N I O N

JOHNSON, Judge.

Robert Paul Dressel, Jr., is charged with several offenses arising from an incident involving his three-year-old daughter. The district court granted Dressel's motion to suppress statements he made to law enforcement officers after taking a polygraph examination, and the state has challenged the district court's ruling in this pre-trial appeal. We conclude that the district court erred by suppressing Dressel's post-polygraph statements on the ground that the statements were made in connection with a polygraph examination. Therefore, we reverse and remand.

## FACTS

On May 1, 2008, Dressel brought his three-year-old daughter to the emergency room at St. Francis Hospital. The emergency room doctor reported that the girl's vaginal opening was torn through to her anal opening and that her labia were bruised. Because of the severity of her injuries, the girl was transferred to Children's Hospital in St. Paul, where an emergency room doctor requested that the Midwest Children's Resource Center (MCRC) evaluate her for possible sexual abuse. In an examination report, one of the MCRC doctors equated the girl's injuries to the type of injuries often experienced by a woman in childbirth. Surgeons at Children's Hospital later performed surgery to repair the injuries.

On May 2, 2008, Shakopee Police Detective Bridget Rettke conducted an investigation into the girl's injuries. Detective Rettke traveled to Children's Hospital, where she met with Dressel, his wife, and a child protection worker. Although the girl was in Dressel's care before he brought her to the hospital, Dressel could not explain to Detective Rettke how the girl's vaginal opening was torn. He stated that he noticed her injury while wiping her buttocks but that he had not been upset or frustrated with her and that he was "not rough with her." When asked whether he placed his finger in the girl's vaginal area, he answered, "I don't think so." Detective Rettke later visited Dressel at his home and asked him to come to the police station for a polygraph examination. Dressel agreed to do so a few days later.

On May 6, 2008, Dressel, his wife, and their daughter visited the Shakopee police station for the polygraph examination, which was administered by Bureau of Criminal Apprehension Special Agent Michael Wold. Before the examination began, Agent Wold explained the process to Dressel and told him that he was not required to take the examination. Agent Wold went over a consent form, which stated that Dressel was taking the polygraph examination "voluntarily, without duress, coercion, threats, or promises." Agent Wold also told Dressel that he was free to leave at any time during or after the examination and that he would not be arrested that day. Dressel signed the consent form and submitted to the examination. During the examination, Dressel stated, consistent with his statements at the hospital, that he did not insert his finger or anything else into the girl's vagina. After the examination, Dressel waited in the lobby while Agent Wold scored the examination and discussed the results with Detective Rettke.

Agent Wold and Detective Rettke then met with Dressel in a conference room to review with him the results of the examination. Agent Wold began the meeting by reiterating that Dressel was free to leave. Detective Rettke showed Dressel that the door was unlocked and reiterated that he would not be arrested that day under any circumstances. Dressel later testified that neither Agent Wold nor Detective Rettke did anything that he viewed as coercive but that he felt trapped in the conference room and that he was not allowed to leave. Agent Wold then told Dressel that he had failed the polygraph examination in a "pretty significant" way. Agent Wold told Dressel that he believed that Dressel had caused his daughter's injuries.

Dressel at first denied hurting the girl but eventually provided information indicating that he did cause the girl's injuries. He explained that he was in the kitchen of his home when his daughter called for help from an upstairs bathroom. Dressel stated that when he arrived upstairs, he found her standing in front of the toilet without pants and underwear and with her buttocks covered in diarrhea. Dressel told Agent Wold and Detective Rettke that this made him "very angry" and that he "just snapped." Dressel stated that he used a moist paper cloth to wipe her bottom and that he did so "very forcefully." Dressel stated that he "jabbed" the girl in her vagina with his fingers wrapped in the paper cloth, putting as many as four fingers into her vagina in a manner that he described as "very rough" and "very rapidly and very hard." Dressel stated that he felt the skin give way and saw that the paper cloth was covered in blood, at which point he stopped wiping her and wrapped her in a towel. When asked whether he had used any object on the girl, he stated, "It was just my fingers." The post-polygraph interview lasted approximately one-

and-one-half hours. Afterward, Detective Rettke gave Dressel a ride to his home.

On May 13, 2008, the state charged Dressel with four felonies: criminal sexual conduct in the first degree, in violation of Minn.Stat. § 609.342, subd. 1(a) (2006); criminal sexual conduct in the second degree, in violation of Minn.Stat. § 609.343, subd. 1(h)(ii) (2006); malicious punishment of a child, in violation of Minn.Stat. § 609.377, subd. 5 (2006); and assault in the third degree, in violation of Minn.Stat. § 609.223, subd. 1 (2006).

In October 2008, Dressel moved to suppress both his oral statements to Detective Rettke at Children's Hospital and his oral statements to Agent Wold and Detective Rettke at the Shakopee police station. Dressel argued that both statements were not voluntary and were obtained without a *Miranda* warning. The district court conducted an omnibus hearing at which it received testimony from Agent Wold, Detective Rettke, and Dressel. The district court also admitted into evidence audiorecordings of Dressel's statements at Children's Hospital and at the Shakopee police station and a videorecording of the polygraph examination.

In an order filed December 5, 2008, the district court denied Dressel's motion to suppress the statements he provided at Children's Hospital because he was not in custody and because the statements were "clearly voluntary." The district court, however, granted Dressel's motion to suppress the statements he provided at the police station because, among other reasons, they were "an extension of the polygraph examination" and, therefore, inadmissible. The state appeals the suppression of the statements provided by Dressel at the police station.

## ISSUES

I. Would suppression of Dressel's post-polygraph statements have a critical impact on the state's prosecution of the offenses with which he is charged?

II. Are the statements made by Dressel at the Shakopee police station inadmissible on the ground that they were made following a polygraph examination?

## ANALYSIS

The state argues that the district court erred by granting Dressel's motion to suppress statements he provided to Agent Wold and Detective Rettke in the post-polygraph interview. Before considering the substance of the state's argument, we first must address the threshold issue whether the state may pursue this pretrial appeal.

### I.

 When the state appeals from a pretrial order, it "must clearly and unequivocally show ... that the trial court's order will have a critical impact on the state's ability to prosecute the defendant successfully." *State v. Scott*, 584 N.W.2d 412, 416 (Minn.1998) (quotation omitted). The critical-impact test "is intended to be a demanding standard" and requires the state to show that the ruling " 'significantly reduces the likelihood of a successful prosecution.' " *State v. Rambahal*, 751 N.W.2d 84, 89 (Minn.2008) (quoting *State v. McLeod*, 705 N.W.2d 776, 784 (Minn. 2005)). The state may satisfy the critical-impact test even if a district court's ruling affects the likelihood of successful prosecution of only some of the charges. *State v. Kiminski*, 474 N.W.2d 385, 389 (Minn.App. 1991), *review denied* (Minn. Oct. 11, 1991); *see also State v. Ault*, 478 N.W.2d 797, 799 (Minn.App.1991) ("a defendant's confession may have a 'critical impact' even though the state has other substantial evidence of guilt").

■ When analyzing critical impact after a district court has granted a motion to suppress evidence,

an appellate court should first examine all the admissible evidence available to the state in order to determine what impact the absence of the suppressed evidence will have. The analysis should not stop there, however. The court should go on to examine the inherent qualities of the suppressed evidence itself, its relevance and probative force, its chronological proximity to the alleged crime, its effect in filling gaps in the evidence viewed as a whole, its quality as a perspective of events different from those otherwise available, its clarity and amount of detail and its origin. Suppressed evidence particularly unique in nature and quality is more likely to meet the critical impact test.

*In re Welfare of L.E.P.*, 594 N.W.2d 163, 168 (Minn.1999) (citations omitted).

The state argues that the district court's suppression of Dressel's post-polygraph statements would have a critical impact on the state's case because the post-polygraph statements make clear that Dressel intended to injure the girl, in contrast to the statements he provided at Children's Hospital, which were vague and suggested merely that the girl's injuries were accidental. At Children's Hospital, Dressel stated that he was not sure how the girl's injuries occurred, that he "was not rough with her," and that he was not upset or frustrated when he was wiping her. His post-polygraph statements, however, have a very different import; then, he said that he was "very angry" when he wiped the girl, that he placed as many as four fingers into her vagina, and that he wiped her "very rapidly and very hard." His post-polygraph statements provide additional "clarity" and "detail," fill "gaps in the evidence viewed as a whole," and provide "a

perspective of events different from those otherwise available." *In re L.E.P.*, 594 N.W.2d at 168. This is especially true in light of the girl's young age and limited language skills, which make it more difficult for the state to prosecute the case without Dressel's statements.

In light of the differences between the statements Dressel provided at the hospital and the statements he provided at the Shakopee police station, we conclude that the suppression of Dressel's post-polygraph statements would "significantly reduce[ ] the likelihood of a successful prosecution" and, therefore, would have a critical impact on the state's case. *McLeod*, 705 N.W.2d at 787 (holding that state established critical impact in case alleging criminal sexual conduct involving children) (quotation omitted); *State v. Ronnebaum*, 449 N.W.2d 722, 724 (Minn. 1990) (stating that "the suppression [of a confession] normally will significantly reduce the likelihood of a successful prosecution" in cases of criminal sexual conduct).

## II.

As stated above, the thrust of the state's appeal is that the district court erred by granting Dressel's motion to suppress statements he provided to Agent Wold and Detective Rettke in the course of the post-polygraph interview. "When reviewing a district court's pretrial order on a motion to suppress evidence, we review the district court's factual findings under a clearly erroneous standard and the district court's legal determinations de novo." *State v. Gauster*, 752 N.W.2d 496, 502 (Minn.2008) (quotation omitted).

■ Polygraph examinations often are used by law enforcement for investigatory purposes and, consequently, "may frequently lead to confessions or the discovery of facts which may ultimately lead to

the solution of many crimes." *State v. Kolander*, 236 Minn. 209, 221, 52 N.W.2d 458, 465 (1952). Although polygraph examinations are useful investigatory tools, the caselaw prohibits three types of polygraph-related evidence from being admitted into evidence during a criminal trial. The first type of inadmissible polygraph-related evidence is the results of a polygraph examination. *Kolander*, 236 Minn. at 222, 52 N.W.2d at 465 ("the results of a lie-detector test [are not] admissible"). The rationale for this rule is that a polygraph examination does not have "such scientific and psychological accuracy, nor its operators such sureness of interpretation of results shown therefrom, as to justify submission thereof to a jury as evidence of the guilt or innocence of a person accused of a crime." *Id.* at 221–22, 52 N.W.2d at 465.

The second type of inadmissible polygraph-related evidence is a reference to a defendant's willingness or refusal to submit to a polygraph examination. *State v. Anderson*, 261 Minn. 431, 437, 113 N.W.2d 4, 8 (1962) (affirming exclusion of defendant's proffered evidence of willingness to submit to polygraph); *Kolander*, 236 Minn. at 221–23, 52 N.W.2d at 465–66 (reversing conviction because state introduced evidence of defendant's refusal to submit to polygraph). The rationale for this rule is that the "impact upon the minds of the jurors of a refusal to submit to something which they might well assume would effectively determine guilt or innocence ... might well be more devastating than a disclosure of the results of such test." *Id.* at 222, 52 N.W.2d at 465.

The third type of inadmissible polygraph-related evidence is a reference to the fact that a defendant actually submitted to a polygraph examination. *State v. Perry*, 274 Minn. 1, 12–13, 142 N.W.2d 573, 580 (1966); *cf. State v. Fenney*, 448 N.W.2d 54, 61–62 (Minn.1989) (holding

that admission of reference to polygraph was harmless error). The supreme court has reasoned that this rule is simply an "extension" of the rule that makes the results of a polygraph examination inadmissible. *Perry*, 274 Minn. at 12, 142 N.W.2d at 580.

■ Notwithstanding the aversion to evidence that expressly mentions polygraph examinations, evidence obtained in connection with a polygraph examination is not inadmissible merely because the evidence was obtained in connection with a polygraph examination. *State v. Jungbauer*, 348 N.W.2d 344, 346–47 (Minn.1984) (affirming admission of confession made by defendant following polygraph examination). Rather, evidence obtained through the use of a polygraph examination is presumptively admissible, subject to generally applicable principles concerning pretrial statements made by criminal defendants. *See, e.g., State v. Wiernasz*, 584 N.W.2d 1, 3–5 (Minn.1998) (considering but rejecting argument for suppression of post-polygraph statements based on *Miranda*).

■■ The primary factor affecting the admissibility of a statement arising from a polygraph examination is the voluntariness of the statement. *Jungbauer*, 348 N.W.2d at 346. As this court previously has stated, "admissions made by an accused during the course of a polygraph examination are admissible where found to be voluntarily made." *State v. Erickson*, 403 N.W.2d 281, 283 (Minn.App.1987) (quotation omitted). When determining the voluntariness of a statement given during or in connection with a polygraph examination, courts should apply the concepts that generally apply to the admissibility of statements by considering numerous factors. *Jungbauer*, 348 N.W.2d at 346; *Erickson*, 403 N.W.2d at 284–85 (considering but rejecting defendant's argument that investigators used "psychologically coer-

cive" tactics during polygraph examination).

 In the specific context of a polygraph examination, the courts have recognized two particular factors that may cause such a statement to be involuntary. First, a statement provided in connection with a polygraph examination may be deemed involuntary if a law enforcement officer "misrepresent[ed] the reliability of the test." *Id.*; *see also State v. Davis,* 381 N.W.2d 86, 88 (Minn.App.1986) (affirming district court's finding that written statement provided after polygraph was involuntary, in part because examiner "attempted to convince [defendant] that the polygraph test is foolproof"). Second, a statement provided in connection with a polygraph examination may be deemed involuntary if a law enforcement officer has "falsely impl[ied] that the results will be admissible in evidence." *Jungbauer,* 348 N.W.2d at 346. These two factors are not the only criteria for the voluntariness of statements given in connection with a polygraph examination; they simply are two that have been identified by the supreme court. The Minnesota caselaw is consistent with the general view expressed in *Wyrick v. Fields,* 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982) (per curiam), that even though the results of a polygraph examination were held to be inadmissible in that case, "statements ... made in response to questioning during the course of the polygraph examination surely would have been" admissible. *Id.* at 48 n. *, 103 S.Ct. at 396 n. *.

 In this case, Dressel argued to the district court that his post-polygraph statements at the Shakopee police station should be suppressed because they were involuntary and because they were obtained in violation of *Miranda.* The district court did not resolve either of those two arguments. Rather, the district court stated that the two issues raised by Dressel "need not be addressed ... because polygraph examination results and 'any direct or indirect references to the taking of or refusal to take such a test are inadmissible.'" (Quoting *Fenney,* 448 N.W.2d at 61–62.) The district court reasoned in part that Dressel's post-polygraph statements are inadmissible because they cannot "be separated from identifiable references to the polygraph examination" and are "inextricably intertwined with" the results of the polygraph examination because they are "inherently premised upon the defendant's failure of" the examination.

 The district court's analysis of the admissibility of statements obtained in connection with a polygraph examination is incorrect as a matter of law. As the above-described caselaw illustrates, the supreme court and this court consistently have made distinctions between, on the one hand, evidence expressly referring to an actual or proposed polygraph examination and, on the other hand, evidence consisting merely of a statement that was obtained in connection with a polygraph examination but which does not refer to the polygraph examination. The former type of evidence generally is inadmissible, but the latter type of evidence is admissible unless there is an independent reason for it to be inadmissible. This distinction is based on the premise that evidence of statements given in connection with a polygraph examination can and will be shorn of any reference to the polygraph examination itself. If the state wishes to offer oral testimony concerning a defendant's polygraph-related statements, its witnesses may not refer to the polygraph examination. *See Erickson,* 403 N.W.2d at 283, 285 (holding that district court did not err by admitting defendant's voluntary written and oral statements made during polygraph without making any reference to

polygraph); *State v. Conklin*, 406 N.W.2d 84, 88 (Minn.App.1987) (holding that district court did not err by admitting evidence alluding to defendant's distortion of answers to questions but not disclosing existence of polygraph). Similarly, if the state wishes to offer documentary evidence concerning a defendant's polygraph-related statements, such as a transcript of a polygraph examination or post-polygraph interview, its exhibits should be prepared in such a way that they do not refer to the polygraph examination. *See State v. Opsahl*, 513 N.W.2d 249, 253 (Minn.1994) (stating that prosecutor should have redacted written statements provided to grand jury so as to remove references to polygraph); *State v. Winter*, 668 N.W.2d 222, 226–27 (Minn.App.2003) (holding that district court plainly erred by permitting state to introduce transcripts and videotape of polygraph without redactions of references to polygraph). Assuming that a district court observes these safeguards, statements given in connection with a polygraph examination may be introduced without implicating any of the concerns arising from express references to polygraph examinations.

■ The district court also reasoned that Dressel's post-polygraph statements are inadmissible because "[a]llowing even a portion of these statements would immediately place the defendant in the difficult position of having to decide whether to invoke the limited exception allowed under [*State v. Schaeffer*, 457 N.W.2d 194 (Minn. 1990)] to provide the context under which the statements were given." The district court was referring to a case in which the supreme court held that it was not error for a district court to permit a defendant to offer evidence expressly referring to a polygraph examination in response to the state's introduction of a statement made in connection with the polygraph examination. *Schaeffer*, 457 N.W.2d at 197. The defendant sought to introduce that evidence to explain "the circumstances surrounding the making of the confession." *Id.* at 196. The supreme court in *Schaeffer* affirmed the introduction of such evidence because a defendant in a criminal case has a constitutional right to "present evidence to the jury on the circumstances surrounding the making of a confession." *Id.* (citing *Crane v. Kentucky*, 476 U.S. 683, 688–91, 106 S.Ct. 2142, 2145–47, 90 L.Ed.2d 636 (1986)). But a defendant's constitutional right to offer such evidence is not a requirement, nor is it a reason to prevent a post-polygraph statement from being admitted by the state in the first instance. If that were so, the rationale of *Crane* would become irrelevant because the situation in which it applies never would arise. The holding of *Schaeffer* cannot be applied to preclude the state from introducing evidence of a statement made in connection with a polygraph examination; rather, *Schaeffer* applies only if a defendant wishes to introduce evidence expressly mentioning a polygraph examination as a means of explaining a statement that previously was admitted. Thus, the district court erred in reasoning that "[f]orcing a defendant to decide between admitting he failed a polygraph examination and remaining silent while the prosecution introduces statements made as a direct result of being challenged with the same results is no real choice at all."

The district court further explained its decision to grant Dressel's motion to suppress by stating that it was "deeply troubled by the logic and methodology used to obtain the statements now being challenged." The district court noted that the ostensible purpose of the polygraph examination was to determine the truthfulness of the statements that Dressel had provided while at the hospital. The district court criticized the investigators for continuing

to question Dressel after completing the polygraph examination and, presumably, achieving the original purpose of the examination. The district court also criticized the investigators for not attempting to test the veracity of Dressel's post-polygraph statements in the same way, presumably with a second polygraph examination. The district court further criticized the investigators for continuing to question Dressel even after his "complete emotional breakdown" and for employing tactics that the district court described as "bumping up against borders of existing case law, and at times overstepping the boundaries established by the courts."

The district court's last criticism goes to the issue of voluntariness, which is yet to be resolved. The district court's other criticisms are inconsistent with the essential nature of the work of law enforcement officers, who are responsible for investigating violations or suspected violations of the criminal laws and apprehending wrongdoers. As the United States Supreme Court has recognized, "stealth and strategy are necessary weapons in the arsenal of the police officer." *Sherman v. United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 820–21, 2 L.Ed.2d 848 (1958); *see also State v. Clark,* 738 N.W.2d 316, 344 (Minn. 2007) (noting that police have "duty to identify and vigorously investigate any clues that could lead to the arrest ... of persons who may have played a role" in a crime); *State v. George,* 557 N.W.2d 575, 579 (Minn.1997) (noting that "police must be able to seek the cooperation and ask questions of individuals if the safety and security of the community is to be preserved" (quotation omitted)). The decisions of law enforcement officers concerning whether, when, and how to conduct their investigations generally are beyond judicial review in a criminal case, except when an officer's actions may have violated a defendant's rights in some specific way.

In the absence of such a violation, and in the absence of an agreement between the officers and Dressel concerning the scope of the polygraph examination and post-polygraph interview, there is no legal basis to suppress Dressel's post-polygraph statements on the ground that the officers pursued their investigation further than necessary to satisfy the originally stated purpose of the polygraph examination.

## DECISION

The district court's suppression of Dressel's post-polygraph statements would have a critical impact on the state's case; thus, the state may pursue this appeal of the district court's pretrial ruling. The district court erred by suppressing Dressel's post-polygraph statements on the ground that they were made in connection with a polygraph examination. Because the district court did not fully analyze and resolve Dressel's arguments that his post-polygraph statements should be suppressed on grounds of involuntariness or a violation of *Miranda,* the matter is remanded for further consideration of Dressel's motion.

**Reversed and remanded.**