# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## September 2015 Term

_____

No. 14-0937

_____

FILED

**October 7, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**STATE OF WEST VIRGINIA,**
**Plaintiff Below, Respondent**

**V.**

**TYLER G.,**
**Defendant Below, Petitioner**

_____

Appeal from the Circuit Court of Hancock County
Honorable Martin J. Gaughan, Judge
Criminal Action No. 13-F-44

**AFFIRMED**
_____

Submitted:  September 23, 2015
Filed:  October 7, 2015

Christopher Alan Scheetz                  Patrick Morrisey
Follansbee, West Virginia                  Attorney General
Attorney for Petitioner                    Shannon Frederick Kiser
                                           Assistant Attorney General
                                           Charleston, West Virginia
                                           Attorneys for Respondent

JUSTICE DAVIS delivered the Opinion of the Court.

JUSTICE KETCHUM dissents and reserves the right to file a dissenting opinion.

**SYLLABUS BY THE COURT**

1.    "When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below.  Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues.  Therefore, the circuit court's factual findings are reviewed for clear error."  Syllabus point 1, *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996).

2.    "The State must prove, at least by a preponderance of the evidence, that confessions or statements of an accused which amount to admissions of part or all of an offense were voluntary before such may be admitted into the evidence of a criminal case."  Syllabus point 5, *State v. Starr*, 158 W. Va. 905, 216 S.E.2d 242 (1975).

3.    "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden.  An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution.  The evidence need not be inconsistent with every conclusion save that

i

of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syllabus point 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

4. "W. Va. Code, 49-5-17 . . . [, now W. Va. Code § 49-5-103 (2015) (Supp. 2015),] does not prohibit the use of juvenile law enforcement records against a defendant in a criminal case as rebuttal or impeachment evidence." Syllabus point 2, *State v. Rygh*, 206 W. Va. 295, 524 S.E.2d 447 (1999).

5. It is well-settled that any reference to a criminal defendant's offer or refusal to take a polygraph examination, and the results of a polygraph examination, are inadmissible. Likewise, evidence that a defendant in a criminal case took a polygraph examination also is inadmissible.

6. Although polygraph-related evidence has been deemed inadmissible in this State, the improper admission of such evidence does not automatically warrant a new trial. Rather, improperly admitted evidence involving a polygraph examination is subject to

ii

a harmless error analysis.

7.     "Where the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error."  Syllabus point 5, *State v. Smith*, 156 W. Va. 385, 193 S.E.2d 550 (1972).

**Davis, Justice**:

Petitioner, Tyler G.,[1] appeals from an order of the Circuit Court of Hancock County that sentenced him to prison, after a jury convicted him of three sexual offenses against an infant. In this appeal, Petitioner has assigned error to the following: (1) failure to suppress statements made to police, (2) insufficiency of evidence of guilt, (3) improper use of information from juvenile record, (4) mentioning of polygraph during trial, (5) prejudicial effect of cumulative errors, and (6) ineffective assistance of counsel. After a careful review of the briefs submitted by the parties, the record submitted for appeal, the oral arguments presented to this Court, and the applicable case law, we affirm.

## I.

## FACTUAL AND PROCEDURAL HISTORY

The record in this case indicates that the Petitioner began dating A.M. in May of 2012. A.M. was approximately twenty years old at the time and was living with her parents in Hancock County. A.M. also had an infant daughter less than two years old, L.S., the victim in this case. Shortly after A.M. began her relationship with the Petitioner, she

---

[1]Given the sensitive nature of the facts involved in this proceeding, we decline to identify the last name of petitioner. For the same reason, the victim and her mother will be identified by their initials. *See, e.g.*, *State v. Robert Scott R., Jr.*, 233 W. Va. 12, 754 S.E.2d 588 (2014) (per curiam); *State v. Larry A.H.*, 230 W. Va. 709, 742 S.E.2d 125 (2013) (per curiam); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

contracted the sexually transmitted disease known as HPV (human papillomavirus). A.M.

believed that she contracted the disease from the Petitioner because he was the only person

with whom she was intimate at that time. Consequently, A.M. ended her relationship with

Petitioner.

A.M. resumed her relationship with the Petitioner after about a month of

separation. After the relationship resumed, it appears that A.M. would frequently stay at the

Petitioner's home,[2] and Petitioner would on occasion stay with A.M. at her parents' home.

On December 10, 2012, A.M.'s father was admitted to a hospital for back surgery.[3] A.M.

invited Petitioner to spend the night at her parents' home so that she would not be alone with

her baby, L.S. The Petitioner agreed to come over and spend the night with A.M. When they

went to bed L.S. was placed between A.M. and Petitioner.[4] The next morning, December 11,

the Petitioner got up and left the house. The Petitioner left a note saying he had to go to a

GED class.[5] A.M. spoke with the Petitioner later that day by phone. During the phone

conversation the Petitioner stated "that he accidentally bumped [L.S.]" A.M. did not know

---

[2]The Petitioner, who was nineteen at the time, was living with his mother.

[3]A.M.'s mother stayed overnight at the hospital with her husband.

[4]A.M. testified that she did not have sexual intercourse with Petitioner on the night of December 10, and that she never had sex with Petitioner while L.S. was in the room with them.

[5]A.M. actually woke up as the Petitioner was leaving. The Petitioner told A.M. that he was going to a GED class and kissed her before he left.

2

what was meant by the remark.

On December 25, 2012, A.M. took L.S. to a local hospital because of an ear infection and an apparent diaper rash in her anal area that would not clear up. While at the hospital, A.M. was told that the diaper rash appeared to be hemorrhoids, but that she should take L.S. to a pediatrician. A.M. took L.S. to a pediatrician. The pediatrician informed A.M. that the bumps around L.S.'s anal area appeared to be genital warts and that she should take the child to a gynecologist. A.M. took the child to a gynecologist. The gynecologist determined that L.S. did not have a diaper rash. Instead, L.S. was diagnosed with severe HPV. A.M. was told that surgery was necessary to remove the warts. A.M. eventually took L.S. to Weirton Medical Center on February 8, 2013, to have the genital warts removed.

While A.M. was at the hospital with L.S., hospital officials made a child abuse report to the Department of Health and Human Resources ("DHHR") and the local police. Several police officers and a DHHR investigator came to the hospital and met with A.M. and the doctor who removed the genital warts from L.S. The police and the DHHR investigator were informed that the Petitioner and A.M.'s father were the only two males that were around L.S. They also were informed by the doctor that the genital warts were around the baby's anal area and were actually inside her anal cavity. This information prompted a formal child abuse and criminal investigation.

3

The police left the hospital and went to the Petitioner's home to interview him. The Petitioner agreed to accompany the police to the local police station for the interview. During the interview, the Petitioner stated that when he stayed the night at A.M.'s home on December 10, 2012, he "accidentally touched" L.S., and that he was "ashamed, embarrassed, upset that he did it." After the police concluded their questioning of the Petitioner, he left the police station and went home.

On the morning of February 11, 2013, the Petitioner's mother dropped him off at the police station. It appears that the Petitioner had been asked to come to the police station to take a polygraph examination. The polygraph examination was administered, to the Petitioner by a state police officer. After the polygraph was administered, the Petitioner was informed that some of his answers showed inconsistencies. Consequently, the Petitioner was asked to provide a post-polygraph interview. The Petitioner agreed to provide the interview. During the initial part of the interview, the Petitioner denied having sexual contact with L.S. However, during subsequent questioning by other police officers, the Petitioner stated it was possible that he could have had sexual contact with L.S., but he could not remember. The Petitioner went on to describe the following:

> There was an event that he woke up during the night and his erect penis was exposed from his underwear and he was laying against the child, which was between him and the child's mother at the time in the bed. And her clothes, at least the bottom half, was off of her and he was laying up against the child's butt.

4

The Petitioner was asked if it was "possible that he entered her rectum at any time. He said it was possible, but he didn't really recall for sure." Finally, the Petitioner was asked "is there any possible way that the penis did enter the anus of the baby?" The Petitioner responded yes to the question. The Petitioner was allowed to go home after the interview.

As a result of the criminal investigation, the police arrested the Petitioner on February 19, 2013. Subsequently, a grand jury returned a three-count indictment against the Petitioner in April of 2013. The indictment charged the Petitioner with first-degree sexual assault, sexual abuse by a custodian, and child abuse resulting in serious injury. The case went to trial in May of 2014. The jury returned a verdict convicting the Petitioner of all three counts of the indictment. The circuit court thereafter sentenced the Petitioner to not less than twenty-five years nor more than one hundred years for first-degree sexual assault;[6] not less than ten years nor more than twenty years for sexual abuse by a custodian;[7] and not less than two years nor more than ten years for child abuse resulting in serious injury.[8] This appeal followed.

---

[6]This sentence was suspended under the condition that the Petitioner successfully complete the Youthful Offender Program at the Anthony Correctional Center.

[7]This sentence was ordered to be served consecutive to the first-degree sexual assault sentence.

[8]This sentence was ordered to run concurrently with the sexual abuse by a custodian sentence.

## II.

## STANDARD OF REVIEW

The Petitioner asserts six assignments of error. The issues presented have specific review standards. Therefore, we will dispense with setting out a general standard of review. Specific standards of review will be discussed separately as we address each assignment of error.

## III.

## DISCUSSION

The issues assigned for our review by the Petitioner are as follows: (1) failure to suppress statements made to police, (2) insufficiency of evidence of guilt, (3) improper use of information from juvenile record, (4) mentioning of polygraph during trial, (5) prejudicial effect of cumulative errors, and (6) ineffective assistance of counsel. We will consider separately each assignment of error.

### A. *Failure to Suppress Statements Made to Police*

The first issue raised by the Petitioner is that the circuit court committed error in denying his motion to suppress inculpatory statements he made to the police. The State contends that the statements were voluntarily made. Therefore, the trial court did not abuse its discretion in denying Petitioner's motion to suppress.

6

This Court has held that "[a] trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence."  Syl. pt. 3, *State v. Vance*, 162 W. Va. 467, 250 S.E.2d 146 (1978).  We elaborated further in Syllabus point 2 of *State v. Farley*, 192 W. Va. 247, 452 S.E.2d 50 (1994), as follows:

> This Court is constitutionally obligated to give plenary, independent, and *de novo* review to the ultimate question of whether a particular confession is voluntary and whether the lower court applied the correct legal standard in making its determination.  The holdings of prior West Virginia cases suggesting deference in this area continue, but that deference is limited to factual findings as opposed to legal conclusions.

Finally, we pointed out in syllabus point 1 of *State v. Lacy*, 196 W. Va. 104, 468 S.E.2d 719 (1996) that:

> When reviewing a ruling on a motion to suppress, an appellate court should construe all facts in the light most favorable to the State, as it was the prevailing party below. Because of the highly fact-specific nature of a motion to suppress, particular deference is given to the findings of the circuit court because it had the opportunity to observe the witnesses and to hear testimony on the issues.  Therefore, the circuit court's factual findings are reviewed for clear error.

It is well-settled that the State has the burden of proving that inculpatory statements of the accused were voluntarily given.  We set forth this principle in Syllabus point 5 of *State v. Starr*, 158 W. Va. 905, 216 S.E.2d 242 (1975), as follows:

> The State must prove, at least by a preponderance of the

7

evidence, that confessions or statements of an accused which amount to admissions of part or all of an offense were voluntary before such may be admitted into the evidence of a criminal case.

*Accord State v. Blackburn*, 233 W. Va. 362, 368, 758 S.E.2d 566, 572 (2014). In *Farley,* this Court outlined factors that the United States Supreme Court suggested may be considered in determining whether inculpatory statements were made voluntarily:

> In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances–both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused; his lack of education; or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.

*Farley*, 192 W. Va. at 258, 452 S.E.2d at 61 (internal quotations and citations omitted).

In the instant proceeding, the Petitioner has not alleged that he was forced to go to the police station on the two occasions that he was interviewed. The Petitioner has not alleged that the police failed to read him his *Miranda* rights[9] before questioning him–assuming this was necessary.[10] It has not been alleged that the police told the Petitioner

---

[9]*See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[10]We previously have explained that *Miranda* warnings are not necessary when a person is not in custody. *See State v. Farley*, 192 W. Va. 247, 254 n.10, 452 S.E.2d 50, 57

(continued...)

8

he was not free to leave the police station at any time. The Petitioner has not argued that the police physically abused or threatened him. The Petitioner argues that his inculpatory statements were not voluntary because (1) he was nineteen years old, (2) he had only a tenth grade education, (3) he had a limited ability to process information, (4) he was scared and intimidated by the questioning, (5) he was questioned over two days for about ten to twelve hours, and (6) a minimum of six different police officers questioned him.

A hearing was held on the Petitioner's motion to suppress. During the hearing the state presented testimony from four police officers who interviewed the Petitioner. The officers described the inculpatory statements made by the Petitioner.[11] The Petitioner also testified at the suppression hearing and denied making the inculpatory statements.[12] At the conclusion of the hearing, the circuit court stated its reasons for denying the motion as

---

[10](...continued)
n.10 (1994). ("There is a serious question whether the *Miranda* rights are even applicable in this case. . . . The facts indicate that the defendant was not in custody while the interrogation took place. To the contrary, he was told by the police that he was free to leave at any time he chose to do so. Telling a suspect that he/she is not under arrest and is free to leave usually is sufficient to prevent a finding of custody and will circumvent a finding of *de facto* arrest. . . . " (citations omitted)).

[11]The police did not record the interviews with the defendant.

[12]During the suppression hearing it was noted that the Petitioner sought to suppress a written statement he signed, but did not write, and he also sought to prevent the police from providing oral testimony during the trial regarding inculpatory statements he made. The State indicated during the hearing that it was not going to introduce the written statement at trial. Consequently, the trial court held that it would address only the issue of suppressing oral inculpatory statements related by police officers.

9

follows:

So the question now is, are the various oral statements that have been testified to here this morning by the various witnesses, should they be suppressed? It appears to me in listening to all of the testimony, observing the demeanor of all of the witnesses, including the defendant, that to conclude that the officers that testified as to the oral statements made by the defendant were fabricated is beyond belief. I simply cannot accept that they made up all of these statements. There is some consistency to everybody. What I have to say is they all got together, went down to somebody's office and said, "This is what we are going to say as we somehow circle the wagons around [the defendant]." That just defies belief. That is all we are talking about here. There is no constitutional—I realize what [defense counsel] is saying, that [the defendant] may have felt intimidated and that is why he brought out the various physical characteristics of the people interviewing him, but the evidence is really contrary to that.

And, particularly, he knew or should have known that he was free to leave at any time. And what I have to accept is that even though a person is advised of that, that the officers are just joshing, they don't really mean that and they are giving the wink. I can't accept it.

[The defendant] had this one piece of paper in regard to his Miranda rights and he said, "Yes, I am not under arrest and free to leave at any time."

So I am going to deny the motion to suppress any of the statements made by [the defendant] during the course of the interview on both the 8th of February of 2013 and the 11th of February of 2013.

[The defendant], and I must say that he—I think he shows more intellect than what is represented to be. I think he understands what is going on. He ain't no dummy. Maybe he didn't do well in some of his classes. That happens to everybody. I'm sure Albert Einstein flunked a class or two, but

10

I think [the defendant] is bright enough to the extent that he understands what is going on around him, which is the important thing. He is not a dolt. So that is where we are.

We are satisfied that the circuit court properly assessed the evidence presented on the issue the voluntariness of the Petitioner's statements to the police. Equally important, we defer to the trial court's determination that the Petitioner simply was not credible in his denial of making any inculpatory statement to the police. *See People v. Alonso*, No. 1-08-1799, 2011 WL 9548468, at *5 (Ill. App. Ct. June 16, 2011) ("Resolving conflicts in testimony at a suppression hearing is within the province of the trial court and we will not substitute our judgment for that of the trier of fact, where the issue involves conflicting evidence."). On the issue of outright denial of making inculpatory statements, this Court has previously observed that "it is not error for the trial court to admit testimony by the arresting officers that defendant had made oral admissions to them, as her outright denial that any admissions were made merely presented the jury with a simple question of fact as to whether any admissions had in fact been made." *State v. Stevenson*, 147 W. Va. 211, 235, 127 S.E.2d 638, 653 (1962) (internal quotations and citation omitted). *See also State v. Garner*, No. C4-99-1231, 2000 WL 343201, at *2 (Minn. Ct. App. April 4, 2000) ("Although at trial Garner denied making the inculpatory statements, the jury was free to disbelieve her testimony and to rely on [the officer's] account of the conversations instead."). We therefore find no merit to the Petitioner's first assignment of error.

11

### B. *Insufficiency of Evidence of Guilt*

The second issue raised by the Petitioner, while not accurately labeled in his brief, is that the evidence was insufficient to find him guilty of the offenses set out in the indictment. The State argues, and we agree, that the evidence was sufficient for the jury to find the Petitioner guilty beyond a reasonable doubt of each offense under the indictment.

To begin, this Court held in syllabus point 3 of *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995):

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.

We held further in syllabus point 1 of *Guthrie*:

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier

12

of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

The Petitioner argues that the State's evidence failed to present any eyewitness testimony and that the State did not "present any expert testimony that the injuries sustained were consistent only with sexual contact." According to the Petitioner, the evidence showed that it was "more likely than not that the child was infected with the virus through non-sexual contact with her mother." Petitioner notes that A.M. testified that she did not observe anything unusual while in bed during the night that the alleged sexual offenses occurred. Moreover, Petitioner points out that A.M. testified that the baby was wearing her diaper on the morning after the offenses were alleged to have occurred. We do not agree with the Petitioner's narrow characterization of the evidence.

The jury heard medical testimony that the child had genital warts around her anal area and in her anal cavity. Through medical testimony, the jury was informed that "[n]ormally, if seen in either the vaginal or within the vagina, the cervix, the perianal areas, those areas around the rectum[,] . . . [w]e usually assume those to be from sexual contact of some sort." The investigator for DHHR acknowledged that, because of the location of the genital warts, "it would have had to have been either through ejaculate or by direct insertion of the penis into the rectum of the child." A.M. also testified that she contracted HPV and that she believed she contracted it from the Petitioner. The jury also heard testimony that the

13

Petitioner had genital warts but he refused to allow them to be excised for testing that would definitively determine whether he had HPV. Finally, the jury heard testimony from several police officers that the Petitioner admitted that it was "possible" that he inserted his penis into the rectum of the child.

Although, at trial, the Petitioner denied making the inculpatory statement, "the jury resolved that conflict in the testimony against [Petitioner], and the inculpatory statement combined with the considerable amount of circumstantial evidence clearly established defendant's guilt beyond a reasonable doubt." *State v. Summit*, 454 So. 2d 1100, 1104 (La. 1984). We therefore find no merit to Petitioner's insufficiency of evidence assignment of error.

### C. Improper Use of Information from Juvenile Record

The next issue raised by the Petitioner is that the trial court committed error in allowing the State to use information obtained from his juvenile record. The Petitioner contends that the State did not have statutory authorization to obtain his juvenile record, and that he did not have notice that the State would use his juvenile record. The State contends that, under the precedents of this Court, the Petitioner's juvenile record was properly used to impeach his trial testimony.

14

To begin, we note that "rulings on the admissibility of evidence are properly within the discretion of the circuit court, and this Court will not overturn such rulings absent an abuse of discretion." *State v. Doonan*, 220 W. Va. 8, 12, 640 S.E.2d 71, 75 (2006). *See also* Syl. pt. 10, *State v. Huffman*, 141 W. Va. 55, 87 S.E.2d 541 (1955), *overruled on other grounds by State ex rel. R.L. v. Bedell*, 192 W. Va. 435, 452 S.E.2d 893 (1994) ("The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.").

At the time of the Petitioner's prosecution, the statute governing the circumstances under which juvenile records could be disclosed was found at W. Va. Code § 49-5-17 (2005) (Repl. Vol. 2014). However, this statute was repealed in 2015 and recodified at W. Va. Code § 49-5-103 (2015) (Supp. 2015). The recodification did not affect the substantive issue raised in this case. Even so, we will review the issue in the context of the statute as it was codified at the time of Petitioner's prosecution.

In *State v. Van Isler*, 168 W. Va. 185, 283 S.E.2d 836 (1981), this Court addressed the issue of whether information in a juvenile record could be used as evidence in a criminal prosecution during the State's case-in-chief. We resolved the issue in Syllabus point 1 of *Van Isler* as follows:

15

> W. Va. Code, 49-5-17(d) . . . , does not authorize a court to permit juvenile law enforcement records to be used in a criminal case as evidence in chief in the State's case.

168 W. Va. 185, 283 S.E.2d 836. In *State v. Rygh*, 206 W. Va. 295, 524 S.E.2d 447 (1999), we were called upon to recognize an exception to nondisclosure of juvenile records under syllabus point 1 of *Van Isler*.

The defendant in *Rygh* was prosecuted on two counts of felony-murder. The case was bifurcated. Prior to the trial of case, the State filed a motion to unseal the defendant's juvenile law enforcement records so that certain information contained in the records could be available for possible use against the defendant during the mercy phase of the trial. The circuit court granted the motion. The defendant was convicted of the felony-murder charges. During the bifurcated mercy phase, the State used information in the defendant's juvenile records to impeach a witness called by the defendant. In the appeal to this Court, the defendant argued that, under *Van Isler*, information in his juvenile records could not be disclosed during his trial. We disagreed as follows:

> The principal statutory provision regarding the confidentiality of juvenile law enforcement records is found at *W. Va. Code,* 49-5-17 . . . . We stated in *State v. Van Isler,* 168 W. Va. 185, 283 S.E.2d 836 (1981):
>
>> *W. Va. Code,* 49-5-17 . . . ., is part of a comprehensive legislative scheme relating to the handling, disposition and rehabilitation of juvenile offenders. Part of the purpose and intent behind that scheme is to protect the anonymity of

16

juvenile offenders and to assure that they are accorded a fresh start, unhaunted by past trouble, when they reach their majority. This purpose runs throughout Chapter 49 of the Code. The Legislature has used direct forceful language to effectuate this purpose. *W. Va. Code,* 49-7-1 [1978], for example, provides in part: "All records of the state department, the court and its officials, law-enforcement agencies and other agencies or facilities concerning a child as defined in this chapter shall be kept confidential and shall not be released[.]" 168 W. Va. at 186, 283 S.E.2d at 837 (citations omitted).

. . . .

Thus, *Van Isler* (a salutary case that is strongly protective of the confidentiality of juvenile records) recognizes the rule that prohibits the wielding of juvenile records as a "sword" in the prosecution's case-in-chief.

But *Van Isler* also, by clearly limiting its articulation of this rule to the prosecution's case-in-chief, recognizes that the rule does not prohibit the use of juvenile records as a "shield"—to rebut or impeach evidence that is presented by a criminal defendant.

*Rygh*, 206 W. Va. at 298-99, 524 S.E.2d at 450-51. We went on to hold the following in

Syllabus point 2 of *Rygh*:

W. Va. Code, 49-5-17 . . . [, now W. Va. Code § 49-5-103 (2015) (Supp. 2015),] does not prohibit the use of juvenile law enforcement records against a defendant in a criminal case as rebuttal or impeachment evidence.

It is clear that under *Rygh* the State could use information from the Petitioner's

juvenile record to impeach him. The State cross-examined the Petitioner on limited information, gleaned from his juvenile record. The information used by the State showed that the Petitioner missed school frequently, that he often was in trouble at school, and that he had good grades in some classes. This evidence was introduced in response to testimony by the Petitioner that he had learning difficulties; consequently, "the totality of the circumstances of his questioning [by the police] resulted in confusing the Petitioner and rendering the inculpatory statements given to law enforcement unreliable."

As an additional ground for error, the Petitioner argues also that the State failed to file a motion to obtain court approval to unseal his juvenile record. The trial record appears to support this assertion. We believe that *Rygh* required the State to file a motion to unseal Petitioner's juvenile record. However, failure to do so was harmless error. *See State v. Swims*, 212 W. Va. 263, 270, 569 S.E.2d 784, 791 (2002) ("'Error is harmless when it is trivial, formal, or merely academic, and not prejudicial to the substantial rights of the party assigning it, and where it in no way affects the outcome of the trial.'" (quoting *Reed v. Wimmer*, 195 W. Va. 199, 209, 465 S.E.2d 199, 209 (1995))). Insofar as the circuit court allowed the State to use information from Petitioner's juvenile record for impeachment purposes, it is clear that, had the State followed the proper procedure and filed a motion to unseal his juvenile record, the motion would have been granted. For this reason, the error

18

is procedurally harmless.[13]  This is not to suggest that we approve of the State's failure to file a motion to have the record unsealed.

In sum, we find no merit to Petitioner's contention that the State could not impeach him with information taken from his juvenile record.

### D.  Mentioning of Polygraph During Trial

The Petitioner next contends that the trial court erred in denying his motion for a new trial as a result of a State witness mentioning that he took a polygraph examination. The State contends that the error complained of was harmless.  We have held that the standard of review of a trial court's order denying a motion for a new trial is as follows:

> In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review.  We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard.  Questions of law are subject to a de novo review.

Syl. pt. 3, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).

We begin by noting that the issue of improperly introducing polygraph

_____

[13]No part of the Petitioner's juvenile record was actually introduced into evidence.

19

evidence in a criminal trial has been addressed by courts in three contexts. The decision in

*State v. Dressel*, 765 N.W.2d 419 (Minn. Ct. App. 2009), summarized the matter as follows:

> Although polygraph examinations are useful investigatory tools, the caselaw prohibits three types of polygraph-related evidence from being admitted into evidence during a criminal trial. The first type of inadmissible polygraph-related evidence is the results of a polygraph examination. The rationale for this rule is that a polygraph examination does not have such scientific and psychological accuracy, nor its operators such sureness of interpretation of results shown therefrom, as to justify submission thereof to a jury as evidence of the guilt or innocence of a person accused of a crime.
>
> The second type of inadmissible polygraph-related evidence is a reference to a defendant's willingness or refusal to submit to a polygraph examination. The rationale for this rule is that the impact upon the minds of the jurors of a refusal to submit to something which they might well assume would effectively determine guilt or innocence . . . might well be more devastating than a disclosure of the results of such test.
>
> The third type of inadmissible polygraph-related evidence is a reference to the fact that a defendant actually submitted to a polygraph examination. . . . [T]his rule is simply an extension of the rule that makes the results of a polygraph examination inadmissible.

*Dressel*, 765 N.W.2d at 425 (internal quotation marks and citations omitted).

We previously have expressly ruled upon the first two contexts in which

polygraph evidence is prohibited. That is, we long have held that "[p]olygraph test results are

not admissible in evidence in a criminal trial in this State." Syl. pt 2, *State v. Frazier*, 162 W.

20

Va. 602, 252 S.E.2d 39 (1979). We also have ruled that "[r]eference to an offer or refusal by a defendant to take a polygraph test is inadmissible in criminal trials to the same extent that polygraph results are inadmissible." Syl. pt. 2, *State v. Chambers*, 194 W. Va. 1, 459 S.E.2d 112 (1995). We now hold that, it is well-settled that any reference to a criminal defendant's offer or refusal to take a polygraph examination, and the results of a polygraph examination, are inadmissible. Likewise, evidence that a defendant in a criminal case took a polygraph examination also is inadmissible.

It has been correctly noted that, "[d]espite its status as a pariah . . ., not all references to polygraph tests warrant reversal." *State v. Hawkins*, 326 Md. 270, 276, 604 A.2d 489, 492 (1992) (citation omitted). For example, in *State v. Acord*, 175 W. Va. 611, 336 S.E.2d 741 (1985), we recognized that improperly mentioning a polygraph test result during a trial does not automatically result in a new trial. The defendant in *Acord* was prosecuted for first-degree sexual assault. During the trial, a State witness made an unsolicited remark indicating that he had passed a polygraph examination. Defense counsel immediately moved the circuit court for a mistrial. The circuit court denied the motion, but instructed the jury to disregard the remark. After his conviction, the defendant argued on appeal that the circuit court committed error in denying his motion for a mistrial. We disagreed as follows:

> It is true that polygraph test results are not admissible in evidence in a criminal trial in this State. Therefore, error was

21

> committed when the witness referred to a polygraph test.
> Nevertheless, the statement was withdrawn and the jury was
> instructed to disregard it.  Ordinarily where objections to
> questions or evidence by a party are sustained by the trial court
> during the trial and the jury instructed not to consider such
> matter, it will not constitute reversible error.  While there are
> extraordinary situations where the introduction of evidence is so
> prejudicial that an instruction to disregard such evidence will be
> insufficient and a mistrial should be granted, this case was not
> one of those extraordinary situations.  We, therefore, hold that
> the trial court was correct in refusing the appellant's request for
> a mistrial.

*Accord*, 175 W. Va. at 613, 336 S.E.2d at 744 (internal quotations and citations omitted).  *See also State v. Meadows*, 231 W. Va. 10, 743 S.E.2d 318 (2013) (mentioning of polygraph harmless error); *State v. Porter*, 182 W. Va. 776, 392 S.E.2d 216 (1990) (same);  *See also United States v. Lewis*, 110 F.3d 417, 422 n.2 (7th Cir. 1997) ("Any error in admitting the reference to a polygraph was harmless."); *United States v. Herrera*, 832 F.2d 833, 835 (4th Cir. 1987) ("Although we agree that references to polygraph tests in plea agreements introduced into evidence are improper, we find the error harmless in this instance."); *United States v. Koslosky*, No. ACM 30865, 1995 WL 580889, at *4 (A.F. Ct. Crim. App. Sept. 20, 1995) ("We find there is no prejudice to the appellant in this case as a result of the two inadvertent references to a polygraph."); *Capano v. State*, 781 A.2d 556, 605 (Del. 2001) ("On harmless error analysis, therefore, we hold that the erroneous admission of Lyons' testimony concerning Gerry's polygraph test . . . did not substantially prejudice the defense and that admission of this testimony does not warrant a reversal of Capano's conviction and sentence."); *People v. Fletcher*, 328 Ill. App. 3d 1062, 1075, 768 N.E.2d 72, 83 (2002)

("Therefore, even assuming, arguendo, that the polygraph evidence was improperly admitted, we find the resulting error harmless."); *Majors v. State*, 773 N.E.2d 231, 239 (Ind. 2002) ("the admission of polygraph evidence is subject to harmless error analysis. The probable impact of the polygraph reference upon the verdict is of prime importance."); *Lay v. State*, 659 N.E.2d 1005, 1013 (Ind. 1995) ("because the mention of a polygraph test here could not be said to have guaranteed a conviction, we cannot say that Pike's testimony before the jury amounted to fundamental error requiring reversal of Lay's conviction."); *State v. Harvey*, 151 N.J. 117, 205-06, 699 A.2d 596, 639 (1997) ("On this record, the reference to an unindicted suspect's polygraph results does not constitute reversible error. . . . Any prejudice to defendant was minimal."); *Mayes v. State*, 887 P.2d 1288, 1310 (Okl. 1994) ("Under the circumstances, we find the reference to a polygraph, if error at all, was harmless."); *Lester v. Commonwealth*, No. 0844-99-3, 2000 WL 781336, at \*2 (Va. Ct. App. June 20, 2000) ("In this case, we are satisfied the admission of the polygraph results is harmless."); *State v. Wofford*, 202 Wis. 2d 523, 532, 551 N.W.2d 46, 50 (1996) ("Because admission of the polygraph evidence was harmless error, we conclude that Wofford was not prejudiced by his attorney's performance.").

In view of the foregoing, we now expressly hold that, although polygraph-related evidence has been deemed inadmissible in this State, the improper admission of such evidence does not automatically warrant a new trial. Rather, improperly admitted evidence

involving a polygraph examination is subject to a harmless error analysis.

In the instant proceeding, the State was conducting a direct examination of a police officer when the officer mentioned that the Petitioner had taken a polygraph examination:

> Prosecutor: Okay. Did you – was there another day after that, that you had contact with him [Petitioner]?
>
> Witness: Yes. Two days later.
>
> Prosecutor: On the –
>
> Witness: No, no. Later he came down for another interview. He did have a polygraph done –
>
> Prosecutor: Whoop. May we approach.
>
> The Court: There's no need.
>
> Prosecutor: Okay.
>
> The Court: The polygraph is not admissible, and the discussion of it is not admissible.

The Petitioner argues that he was prejudiced by the witness mentioning the polygraph and by the curative instruction given by the trial court; therefore, he is entitled to a new trial. We disagree.

There is no question that the testimony mentioning that Petitioner took a

24

polygraph test in this case was error. However, this error was harmless. It is clear that the polygraph reference was not solicited by the State. Thus, it was an unforeseen error. Further, the State immediately stopped questioning the witness, and before defense counsel could make an objection, asked to approach the bench about the matter. The trial court promptly responded to the error by instructing the jury, in essence, to disregard the mentioning of the polygraph exam.

As a general matter,

> [w]e normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be devastating to the defendant.

*State v. Mahood*, 227 W. Va. 258, 264, 708 S.E.2d 322, 328 (2010) (internal quotations and citation omitted). *Accord State v. White*, 223 W. Va. 527, 535, 678 S.E.2d 33, 41 (2009). In this case, we believe that the jury understood and followed the circuit court's curative instruction. This was a passing improper remark about a polygraph test that was not "devastating" to the Petitioner in light of the strong admissible evidence of his guilt, as outlined *supra* in Section III. B. of this opinion.[14] *See Canas v. Yates*, No. EDCV 07-00334-

---

[14]The State's brief indicated that another witness mentioned the word polygraph during recross-examination by defense counsel. This issue was not objected to at
(continued...)

VBF (MLG), 2009 WL 3483931, at *9 (C.D. Cal. Oct. 27, 2009) ("[T]estimony that Petitioner had failed a polygraph test was improper . . . [h]owever, the appellate court determined that any error was harmless . . ., given the strong evidence of Petitioner's guilt."). We therefore find that no reversible error flowed from the improper passing mention of the word polygraph.

### E. Cumulative Effect of Errors Was Prejudicial

The Petitioner contends that the errors committed in this case were prejudicial when considered cumulatively.  Under our standard for the application of the cumulative error doctrine, there must be "numerous" errors:

> Where the record of a criminal trial shows that the cumulative effect of *numerous errors* committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error.

Syl. pt. 5, *State v. Smith*, 156 W. Va. 385, 193 S.E.2d 550 (1972) (emphasis added).

Under the decision in *Smith*, the cumulative error doctrine is applicable only when "numerous" errors have been found. *See State v. McKinley*, 234 W. Va. 143, 167 n.22,

---

[14](...continued)
trial nor was it briefed as an assignment of error by Petitioner.  We therefore find this issue waived.  *See State v. Hager*, 204 W. Va. 28, 40, 511 S.E.2d 139, 151 (1998) ("we find that the absence of an objection at trial waives the right to complain on appeal.").

26

764 S.E.2d 303, 327 n.22 (2014) ("In order to invoke the cumulative error doctrine, there must be more than one harmless error. Mr. McKinley cannot rely on this doctrine because only one harmless error was found in this case."); *State v. Cook*, 228 W. Va. 563, 572, 723 S.E.2d 388, 397 (2010) ("While the State concedes that one of the four enumerated evidentiary rulings was error, it argues that the other evidentiary rulings relied upon by Appellant were not an abuse of the trial court's discretion. We agree. Accordingly, we do not find cumulative error justifying a reversal of Appellant's conviction."). Two errors do not constitute "numerous" for purposes of the cumulative error doctrine. Assuming, for the sake of argument, that two errors could be categorized as numerous, collectively the two errors in this case are not so substantial as to have denied the Petitioner a fair trial. It has been correctly observed that "[i]f the errors, while numerous, are insignificant or inconsequential, the case should not be reversed under the doctrine." 1 Louis J. Palmer, Jr., Robin Jean Davis and Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers*, § 103.03[1][e], p. 37 (6th ed. 2015). The two errors found in this case, failure of the State to file a motion to unseal juvenile records and the passing mention of the word polygraph, are clearly insignificant errors. We therefore reject Petitioner's attempt to rely on the cumulative error doctrine.[15]

---

[15]We decline to address Petitioner's ineffective assistance of counsel assignment of error on direct appeal. Our cases have made clear that a "claim of ineffective assistance of counsel is generally not ripe for direct appellate review." *State v. Hutchinson*, 215 W. Va. 313, 599 S.E.2d 736 (2004). *See also* Syl. pt. 10, *State v. Triplett*, 187 W. Va.

(continued...)

27

## IV.

## CONCLUSION

We affirm Petitioner's conviction and sentence for first-degree sexual assault, sexual abuse by a custodian, and child abuse resulting in serious injury.

Affirmed.

---

[15](...continued)
760, 421 S.E.2d 511 (1992) (" It is the extremely rare case when this Court will find ineffective assistance of counsel when such a charge is raised as an assignment of error on a direct appeal. The prudent defense counsel first develops the record regarding ineffective assistance of counsel in a habeas corpus proceeding before the lower court, and may then appeal if such relief is denied. This Court may then have a fully developed record on this issue upon which to more thoroughly review an ineffective assistance of counsel claim.").